Slip Op. 10-10

UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Gregory W. Carman, Judge**

———————————————————————————————  :
                                  :
NUCOR CORPORATION,                :
                                  :
                Plaintiff,        :
                                  :
                and               :
                                  :
UNITED STATES STEEL CORPORATION and AK  :
STEEL CORPORATION,                :     Consol.
                                  :     Court No. 07-00454
                Plaintiff-Intervenors,  :     **PUBLIC VERSION**
                                  :
                v.                :
                                  :
UNITED STATES,                    :
                                  :
                Defendant.        :
———————————————————————————————  :

[The Court affirms, in its entirety, the United States International Trade Commission's Remand Determination, dated July 8, 2009.]

   Wiley Rein LLP, (Daniel B. Pickard; Alan H. Price; Maureen E. Thorson; Lori E. Scheetz) for Plaintiff, Nucor Corporation.

   Skadden, Arps, Slate, Meagher & Flom, LLP, (James C. Hecht; John J. Mangan; Robert E. Lighthizer; Stephen P. Vaughn; Stephen J. Narkin) for Plaintiff-Intervenor, United States Steel Corporation.

   King & Spalding, LLP, (Joseph W. Dorn; Jeffrey M. Telep) for Plaintiff-Intervenor, AK Steel Corporation.

   Kelley Drye and Warren, LLP, (Kathleen W. Cannon; Paul C. Rosenthal; R. Alan Luberda) for Amicus, ArcelorMittal USA.

   James M. Lyons, General Counsel; Andrea C. Casson, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission (Marc A. Bernstein; Robin L. Turner), for Defendant, United States.

                                  Dated: January 27, 2010

<u>OPINION</u>

**CARMAN, Judge:** This matter comes before the Court following its decision in <u>Nucor Corp. v. United States</u>, 33 CIT ___, 605 F. Supp. 2d 1361 (2009), in which the Court remanded a decision of the United States International Trade Commission ("ITC" or "Commission") which found that revocation of certain antidumping and countervailing duty orders would not be likely to lead to the continuation or recurrence of material injury to the domestic hot-rolled steel industry. <u>See</u> <u>Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine</u> ("<u>Final Determination</u>"), USITC Pub. 3956, Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (Review) (Oct. 2007) (PR 453) (CR 427).[1]  This lawsuit arose from Plaintiff's and Plaintiff-Intervenors' challenges to the Commission's <u>Final Determination</u>, and ensuing Motion for Judgment on the Agency Record under USCIT Rule 56.2.  The parties allege, <u>inter</u> <u>alia</u>, that the ITC's negative injury determination in the five-year sunset review of the countervailing duty order on hot-rolled steel products from South Africa and the antidumping duty orders on hot-rolled steel from Kazakhstan, Romania and South Africa was unsupported by substantial evidence.  In its opinion, the Court found that the ITC had failed to provide an adequate

---

[1] Hereinafter all documents in the confidential record will be designated "CR" and all documents in the public record designated "PR."

explanation or substantial evidentiary support for certain findings relating to the likely volume, price effect, and impact of subject imports from the affected countries. As a result, the Court remanded the matter and instructed the Commission to reevaluate and explain more fully its negative injury determination in light of the Court's findings. See Nucor, 33 CIT at ___, 605 F. Supp. 2d 1361, 1381-82.

The Court now reviews the Commission's findings pursuant to the Court's remand[2] ("Remand Determination"), dated July 8, 2009, in which the ITC's revocation decision remains unchanged from the Final Determination. Plaintiff, Nucor Corporation ("Nucor") and Plaintiff-Intervenors, United States Steel Corporation ("U.S. Steel") and AK Steel Corporation ("AK Steel") (collectively "Plaintiffs" or "Domestic Producers") assert that the Remand Determination is also unsupported by substantial evidence or otherwise contrary to law and urge the Court to remand the matter for further consideration. The Commission, joined by Amicus, ArcelorMittal USA,[3] argues that the decision should be sustained. For the reasons set forth below, the Court affirms the Remand Determination of the ITC.

---

[2] All references are made to the confidential version of this document filed under CR 441R.

[3] ArcelorMittal USA ("Mittal USA") is an affiliate of ArcelorMittal International ("ArcelorMittal") which is the corporate parent of the subject producers.

## I. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2006).

## II. STANDARD OF REVIEW

Review of the Commission's redetermination pursuant to the Court's remand is conducted under the substantial evidence and in accordance with law standard, which is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) (2006) ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations and quotation marks omitted). The Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citations and quotation marks omitted). There must be a "rational connection between the facts found and the choice made"

in an agency determination if it is to be characterized as supported by substantial evidence and otherwise in accordance with law. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).

### III. BACKGROUND

The Court presumes familiarity with its decision in Nucor, which provides background discussion on the five-year sunset review that Plaintiffs contest in this judicial proceeding. Below, the Court provides only that background information specific to the Remand Determination now before the Court.

In August and November of 2001, the Commission unanimously determined that the domestic hot-rolled steel industry was materially injured by reason of subsidized imports of hot-rolled steel from Argentina, India, Indonesia, South Africa, and Thailand, and by reason of less than fair value imports of hot-rolled steel from Argentina, China, India, Indonesia, Kazakhstan, the Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine. See Hot Rolled Steel Products From Argentina and South Africa, Inv. Nos. 701-TA-404 and 731-TA-898 and 905 (Final), USITC Pub. 3446 (Aug. 2001) (PR 65); Hot-Rolled Steel Products From China, India, Indonesia, Kazakhstan, The Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine, Inv. Nos. 701-TA-405-408 and 731-TA-899-904 and 906-908 (Final), USITC Pub. 3468 (Nov. 2001) (PR 66) (collectively "Original Determinations"). Accordingly, between

September 2001 and December 2001, the United States Department of Commerce ("Commerce") published countervailing duty orders on hot-rolled steel from Argentina, India, Indonesia, South Africa, and Thailand, as well as antidumping duty orders on hot-rolled steel from Argentina, China, India, Indonesia, Kazakhstan, the Netherlands, Romania, South Africa, Taiwan, Thailand and Ukraine. See Final Determination at I-2.

On August 1, 2006, the Commission initiated five-year sunset reviews to determine whether revocation of the countervailing duty and antidumping duty orders on hot-rolled steel products from Argentina, China, India, Indonesia, Kazakhstan, the Netherlands, Romania, South Africa, Taiwan, Thailand and Ukraine would likely lead to the continuation or recurrence of material injury to the domestic hot-rolled steel industry. See Hot-Rolled Steel Products from Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine, 71 Fed. Reg. 43,521 (Aug. 1, 2006) (PR 3). At the conclusion of the sunset reviews, the Commission determined that revocation of the antidumping and countervailing duty orders on hot-rolled steel from China, India, Indonesia, Taiwan, Thailand and Ukraine would likely lead to the continuation or recurrence of material injury. See Final Determination at 3 (PR 453). However, the Commission determined that revocation of the orders on hot-rolled steel from Argentina, Kazakhstan, Romania and South Africa ("subject

countries") would not be likely to lead to continuation or
recurrence of material injury to an industry in the United States
within a reasonably foreseeable time.[4] Id.

Domestic Producers subsequently initiated actions in this
Court seeking review of the ITC determinations. On March 9, 2009,
after briefing and oral argument the Court remanded the
Commission's negative determinations in part, ordering the ITC to:

> (1) reevaluate its flawed reasoning for the finding that
> ArcelorMittal companies and/or Mittal USA would limit
> subject imports from the subject countries; (2) reassess
> and further explain the basis for its findings that
> significant imports in any region of the country are
> likely to have a disruptive impact on the overall U.S.
> market, and that any pricing practices that would
> negatively impact Mittal USA's competitors are likely to
> also impact Mittal USA; (3) reassess and further explain
> the behavior of ArcelorMittal and its predecessor, the
> Ispat organization, with respect to their business
> practices in exporting to countries in which they
> maintain production facilities; (4) reassess and further
> explain evidence opposed to the ITC's volume
> determination, including excess capacity, export
> orientation of the subject countries' producers,
> attractiveness of the U.S. market, and capacity increases
> in alternative export markets; (5) reassess the potential
> price effects in accordance with its revised volume
> determination; and (6) reassess its likely impact
> analysis in accordance with its revised volume and price
> effects determinations, and account for and explain the
> poor performance of the domestic industry in the latter
> portion of the period of review.

See Nucor, 33 CIT at ___, 605 F. Supp 2d 1361, 1381-83.

On remand, the Commission reopened the record with respect to

_____

[4] Plaintiffs do not challenge the Commission's negative
final determination with respect to hot-rolled steel products
from Argentina. See Plaintiff's Rule 56.2 Mot. for Summ. J. On
the Agency R. at 1 n.1.

certain issues, inviting parties to offer additional information on matters relating to the remand and submit written comments. See Hot-Rolled Steel Products From Kazakhstan, Romania, and South Africa, Inv. Nos. 701-TA-407 and 731-TA-902, 904, 905 (Review) (Remand) 74 Fed. Reg. 21,821 (May 11, 2009). As much of the Court directed inquiry focused on the business practices of ArcelorMittal, the Commission permitted Mittal USA to participate as a party in the proceeding. The Commission issued its Remand Determination on July 8, 2009, once again finding that revocation of the countervailing duty order on hot-rolled steel from South Africa and the antidumping duty orders on hot-rolled steel from Kazakhstan, Romania and South Africa would not be likely to lead to the continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time. See Remand Determination at 2.

## IV. DISCUSSION

This Court's remand instructions were carefully delineated into six areas for further review by the Commission: four involving volume, one involving price effects and one involving likely impact on the domestic industry. See Nucor, 33 CIT at ___, 605 F. Supp 2d 1361. The Court will hew to that framework in evaluating the Commission's determination on remand.

## 1. ArcelorMittal's Limitation of Subject Imports

### A. The Commission's Determination on Remand

Pursuant to the Court's instructions, the Commission specifically examined whether, upon revocation of the antidumping and countervailing duty orders, ArcelorMittal or Mittal USA would limit imports from the subject countries. See Nucor 33 CIT at ___, 605 F. Supp. 2d 1361, 1381. The Commission's analysis once again led it to the conclusion that ArcelorMittal's likely behavior with respect to the hot-rolled steel mills it operates in Kazakhstan, Romania and South Africa would not result in significant volumes of subject imports entering the U.S. market. See Remand Determination at 10. The Commission relied on information submitted by Arcelormittal, in both the five-year reviews and remand proceeding, as evidence of the firm's decision to serve the U.S. market principally through its American subsidiary, Mittal USA. See id. According to the ITC, this strategy of constraining imports in furtherance of maximizing domestic production did in fact serve to maintain price stability and promote Arcelormittal's overall corporate interests. See Defendant's Rebuttal to Plaintiff's Comments on Remand Determination ("ITC Rebuttal Comments") at 15.

**B.   Parties' Arguments**

The Commission argues that ArcelorMittal's strategy for its subsidiaries to supply home and regional markets, and not to serve export markets where the company is a producer, limits the motivation of the subject producers in Kazakhstan, Romania and South Africa to significantly increase shipments to the U.S.

market.[5]   As  support  for  this  position,  Defendant  points  to  the

substantial  investment  ArcelorMittal  has  made  in  its  subsidiary,

Mittal  USA.[6]   Because  Mittal  USA  accounts  for  such  a  large  segment

of  ArcelorMittal's  production  overall,  and  in  light  of  the  domestic

producer's  prominence  in  the  U.S.  market,  the  Commission  concludes,

it  is  in  ArcelorMittal's  best  interests  to  limit  the  amount  of

imports  of  hot-rolled  steel.   Similarly,  the  ITC  points  to  the

decision  by  ArcelorMittal  to  provide  Mittal  USA  with  the  right  to

veto  any  imports  from  other  ArcelorMittal  facilities,  and  its

policy  of  serving  the  U.S.  market  principally  through  Mittal  USA.

See Remand Determination at 10.   Inasmuch  as  the  production  of  hot-

rolled  steel  in  the  subject  countries  is  controlled  entirely  by

ArcelorMittal,  these  practices,  according  to  the  Commission,  "serve

as  a  powerful  deterrent  to  significant  volumes  of  subject  imports

entering  the  U.S."   See id.

        Specifically,  the  Commission  relies  on  statements  from  two  of

_____

        [5] Mills  owned  by  ArcelorMittal  are  responsible  for  virtually
all  production  of  subject  hot-rolled  steel  in  Kazakhstan,  Romania
and  South  Africa.   See Final Determination at 44 n.255.

        [6] Mittal  USA  is  the  composite  of  acquisitions  and
consolidations  of  former  U.S.  steel  companies  owned  and  operated
by  Mittal  Steel  Co.  NV.  In  2006,  Mittal  Steel  Co.  NV  merged  with
Arcelor  SA,  creating  the  new  entity  ArcelorMittal  International.
See Final Determination at 17 n.88. Over  six  billion  dollars  were
spent  in  acquiring  the  companies  that  make  up  Mittal  USA,  which
accounts  for  approximately  [[    ]]  of  Arcelormittal's  worldwide
production  (this  figure  includes  ArcelorMittal's  U.S.  and
Canadian  based  operations).  See ArcelorMittal Factual Submission
on Remand, ex. 7 (CR 433R); Remand Determination at 13.

ArcelorMittal's corporate officers.  The first, Louis L. Schorsch,
the company's president and chief executive officer, provided
testimony during the hearing describing the approval required for
the entry of merchandise from other ArcelorMittal mills.[7]  See
Administrative Record, Tr. at 218-19 (PR 253).  The second, an
affidavit from [[

                        ]] discusses the factors ArcelorMittal
considers in deciding whether or not to export to the United States
merchandise produced in overseas ArcelorMittal facilities.[8]  See
ArcelorMittal Factual Submission on Remand, Ex. 8, ¶ 5 (CR 433R).
In addition, the ITC identifies empirical data from the importer
questionnaires which indicate that U.S. hot-rolled steel imports by
ArcelorMittal decreased noticeably subsequent to the merger of
Arcelor SA and Mittal Steel Co. NV.  See Remand Determination at

---

[7] The relevant portions of Schorsch's testimony include the
statement "Now, we do import some material into the [S]tates in a
variety of products. The way that is done is: Nothing comes into
this market or, for that matter, any other market where we
operate, where we bring material in from another part of the
world without, let's say, the approval and management of the
marketing, or the commercial organization, in that home country.
So the interest of the home country takes precedence." Hearing
Tr. pp. 218-19 (PR 253).

[8] [[




                        ]] ArcelorMittal Factual Submission on
Remand, Ex. 8, ¶ 5 (CR 433R).

12.  This, says the Commission, is the effect of ArcelorMittal's corporate strategy which perceived that maintaining the profitability and market share of Mittal USA was in its overall interest.  See id.

In response to Plaintiffs' theoretical model showing how ArcelorMittal would likely benefit from subject imports even if doing so caused harm to Mittal USA, the Commission found this scenario "lacking in probative value." Id. at 14.  Citing the lack of any documentation to support the figures reported, the ITC argues that even a slight variation of these figures results in adverse financial consequences for ArcelorMittal.  Moreover, the ITC points to the difficulty in precisely gauging the price effects of subject imports in such a manner as to calculate accurately the level of imports necessary to achieve such a favorable result.  See id. at 15.

By contrast, Plaintiffs argue that the record does not support the premise that ArcelorMittal will restrain subject imports from lower production cost facilities if such imports would maximize overall corporate profits.  See Nucor Corporation's Comments on Remand Determination ("Nucor Comments") at 9.  As Plaintiffs recite the record, the evidence demonstrates that if ArcelorMittal can produce and sell steel for consumption in the U.S. more profitably through its mills overseas, "thereby increasing company-wide profits, it will do so." Id.  According to this theory, any

potential harm to Mittal USA would be outweighed by the benefit to Arcelormittal's overall operations.  Plaintiffs argue that it is a core principal of the director/officer's fiduciary duty to maximize profits of the entire company for the benefit of its shareholders. See id.  This basic tenet of corporate law is discussed in two affidavits submitted by Plaintiffs.  The first, [[

            ]] discusses the obligation a corporate officer has to his shareholders, which is the maximization of corporate profits even at the expense of one of its subsidiaries.  See Nucor Factual Submission on Remand, Attachment 1, Affidavit of [[           ]] ¶ 3 (CR 434R) ("I have never witnessed a company make a decision that benefits its subsidiary at a cost to overall operational profits.") The second, Michael Meyers, the general manager of sales of U.S. Steel, speaks to the "imperative that the producer do what is in the best interest of its overall operation, not that of each affiliated entity."  Nucor Comments at 10; U.S. Steel Factual Submission on Remand, Affidavit of Michael Meyers, ¶ 5 (CR 435R). Thus, according to Plaintiffs, "a rational business model requires companies to maximize profits for the entire enterprise, rather than protecting one business unit at the expense of total corporate profits."  Nucor Comments at 10.

     In support of this assertion, U.S. Steel presented two hypothetical profit maximization scenarios purporting to show how ArcelorMittal could serve its overall corporate interest by

importing hot-rolled steel from the subject countries, while
concomitantly causing U.S. prices to fall.  See Comments on the
Remand Determination Filed by United States Steel Corporation
("U.S. Steel Comments") at 11.

    C.  **Analysis**

    During a five-year review, the ITC determines whether
revocation of an antidumping or countervailing duty order "would be
likely to lead to continuation or recurrence of material injury
within a reasonably foreseeable time."  19 U.S.C. § 1675a(a)(1).
In making this decision, the Commission "is required to consider
whether the likely volume, price effect, and impact of imports of
the subject merchandise on the industry will be significant if an
order is revoked."  United States Steel Corp. v. United States, 32
CIT ___, 572 F. Supp. 2d 1334, 1341 (2008) (internal citation
omitted).  Plaintiffs argue that the ITC made several erroneous
findings which it contends are not supported by substantial
evidence.  U.S. Steel and Nucor attack the substantiality of the
Commission's likely volume determination by offering their own
evidence in support of an alternative result.  Essentially,
Plaintiffs claim that the testimony on which they rely is a more
adequate basis from which to draw a conclusion.  The task for the
reviewing court, however, is not to evaluate the evidence the
Commission collects during its review, or to decide the weight to
be assigned to a particular piece of evidence.  See United States

Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996).
It is the Commission's task to evaluate the evidence it collects in
conducting an investigation or review, and "certain decisions, such
as the weight to be assigned a particular piece of evidence, lie at
the core of that evaluative process."  See id.

In the case at bar, the Commission acted within its
discretionary authority when it discounted the probative value of
Plaintiffs' profit maximization scenarios.  On the basis of the
data that was compiled with respect to the risk of adverse price
effects on the circumstances of Plaintiffs' hypothetical, the
Commission evaluated the competing economic data to reach a well-
supported conclusion.  The risk of adverse price effects may well
be considered high in instances, such as the one here, where there
is a high degree of interchangeability between hot-rolled steel
from a variety of sources.  Thus, the likelihood that prices could
be driven to a point that would adversely affect both ArcelorMittal
and Mittal USA is significant.  In addition, the Commission now
points to data from the importer questionnaires which reveal that
imports from ArcelorMittal mills overseas were noticeably [[     ]]
in interim 2007 than in interim 2006.  See Remand Determination at
12 n.45; see also Mittal Steel NA, Importer Questionnaire at 11-13
(CR 155); Arcelor International, Importer Questionnaire at 10-11
(CR 137). Such evidence is consistent with Defendant's argument
concerning the effects of ArcelorMittal's corporate policy of

providing Mittal USA with the right to veto any imports from other ArcelorMittal production facilities.    While it is true, as Plaintiffs point out,[9] that there are circumstances under which ArcelorMittal could conceivably increase its overall profits in the U.S. market even if doing so caused harm to Mittal USA, the mere plausibility of a set of given circumstances is insufficient to overcome the high barrier to reversal of an agency determination. ArcelorMittal's fiduciary obligations to its shareholders and its role as corporate parent are not mutually exclusive.   The welfare of one does not inevitably result in the demise of the other, and Plaintiffs' have offered only innuendo and speculation as evidence to the contrary.   The ITC's reliance on testimony from ArcelorMittal officials about the policies and practices of which these witnesses have first hand knowledge cannot be considered unreasonable.   Therefore, all the agency has done is reach an alternate conclusion based upon data it has assigned greater evidentiary weight.

In its prior opinion, the Court voiced concerns over the sufficiency of the ITC's explanation for its findings on ArcelorMittal's likely behavior upon revocation of the orders at issue here.   On remand, however, the Commission has proffered

---

[9] The two hypothetical scenarios provided by U.S. Steel demonstrate that there are a number of potential combinations of prices and costs that could incentivize the importation of hot-rolled steel from the subject countries. See U.S. Steel Comments at 11.

additional grounds on which it based its original decision.  This

explanation is sufficient to meet the ITC's burden of offering a

rational basis between the facts found and the choices made.

Accordingly, the Court finds the Commission's determination, in

this regard, to be supported by substantial evidence and otherwise

in accordance with law.

2.  **Regional Imports and Pricing Practices**

    A.  **The Commission's Determination on Remand**

    This Court previously objected to the basis cited for the

Commission's determination that significant imports into any region

of the country are likely to have a disruptive impact on the

overall U.S. market, and that any price impact on Mittal USA's

competitors would also negatively impact Mittal USA.  Nucor, 33 CIT

at ___, 605 F. Supp. 2d 1361, 1379.  The Court explained that the

"only data" cited by the Commission in support of its conclusions

was "a chart listing producers and importers by region," and that

with nothing more to rely upon, the Commission's volume

determination could not be sustained.   Id. (citing Final

Determination at Table II-1 (PR 453)).  The Court also pointed to

the testimony of "an executive of ArcelorMittal that its imports

may affect competitors in this market who are in different

geographies or serve different market segments, and so on."  Id.

Accordingly, the Court instructed the Commission to reassess and

further substantiate its findings.  Id. 33 CIT at ___, 605 F. Supp.

2d 1361, 1381.

On remand, the Commission explained that the record does not reveal any regional markets within the United States to which ArcelorMittal could direct subject imports while maintaining stability in the U.S. market overall and protecting its domestic subsidiary from harm.  Remand Determination at 17.  The Commission obtained additional information from Mittal USA during the remand proceeding and concluded that "the record does not indicate any gaps in Mittal USA's geographic coverage."  Id. at 17.

Additionally, the Commission obtained nationwide pricing data for hot-rolled steel and determined that while prices in the United States show some regional variation (owing to freight costs and distances between producers and purchasers), the prices in the different regions show a high degree of correlation.  Id. at 19. The Commission therefore concluded that even if ArcelorMittal were to bring subject imports to a region of the United States where Mittal USA does not produce hot-rolled steel, "any significant influx of imports into a particular region that would cause a regional price dislocation would affect prices nationwide – including those in the regions where Mittal USA does operate mills."  Id. at 20.

Finally, the Commission again considered whether there was any evidence that ArcelorMittal might manufacture niche products in the subject countries that it could import to compete with Mittal USA's

competitors.  In concluding that this was unlikely, the ITC pointed
to three pieces of evidence.  First, in the <u>Final Determination</u>,
the ITC found a high degree of interchangeability between the
products, regardless of source.  <u>Id.</u> at 21.  Second, there were no
purchasers of hot-rolled steel that indicated in response to ITC
questionnaires that Kazakhstan, Romania or South Africa were the
source of any unique niche products.  <u>Id.</u>  Finally, witnesses for
Nucor and U.S. Steel could not identify any niche products that
ArcelorMittal is manufacturing in the subject countries.  <u>Id.</u>

### B.   Parties' Arguments

In response, Plaintiffs point to the testimony of witnesses
Louis Schorsch and [[                ]].  Schorsch testified that
subject imports "may affect competitors in this market who are in
different geographies or serve different market segments, and so
on."  Nucor Comments at 13;  U.S. Steel Comments at 20.   Whereas
[[   ]] suggested that ArcelorMittal is capable of supplying
particular market segments or geographic regions that Mittal USA
would be unable to supply.   Nucor Comments at 13; U.S. Steel
Comments at 20-21.  Plaintiffs are of the opinion that these
statements work as something of an admission against interest by
ArcelorMittal, and should be dispositive on the ITC's likely volume
determination.

Both Nucor and U.S. Steel, once again, rely on the
hypothetical scenarios purporting to show how ArcelorMittal could

benefit financially from importing subject goods, in spite of
having a large domestic presence in the U.S. market.   Nucor
Comments at 15; U.S. Steel Comments at 25.   Nucor also emphasized
that a "large percentage of Mittal USA's domestic sales are sold on
a contract basis."   Nucor Comments at 16.   Nucor reasoned that if
a [[              ]] amount of production by Mittal USA is already
accounted for by long-term contracts, then Mittal USA is only
competing on the spot market for a portion of its overall
production, making it easier to import subject goods without
harming itself.   <u>Id.</u>

    Friend of the Court Mittal USA rebuts Plaintiffs' arguments by
invoking the pricing data and customer list Mittal USA provided to
the Commission on remand which demonstrated "largely identical"
prices by region, and a "widespread" customer base.   ArcelorMittal
USA Rebuttal Comments ("Mittal USA Rebuttal Comments") at 8.
Mittal USA also provided evidence of its "actual business
practices" of "ensur[ing] that prices in a geographic region that
might be served by imports of an affiliate were consistent with
prices in other regions in which Mittal Steel USA was selling, and
did not disrupt U.S. market prices."   <u>Id.</u> at 9.

    Defendant, ITC, rebuts Plaintiffs' arguments by pointing out
that it explicitly considered the testimony of the two
ArcelorMittal executives in its Remand Determination.   ITC Rebuttal
Comments at 16 (<u>citing</u> Remand Determination at 17).   Defendant

points out that neither of the witnesses affirmatively declared

that there <u>were</u> "U.S. regional markets or specialty products that

Mittal USA could not serve or supply," but instead had phrased

their comments "in the conditional."  <u>Id.</u>  The Commission also

defended its consideration of the niche products argument by

pointing out that neither Nucor nor U.S. Steel identified "any hot-

rolled steel products that they produce, but Mittal USA does not."

<u>Id.</u> at 20.  The ITC found this inability of Plaintiff and

Plaintiff-Intervenor to be weighty, and thereby concluded that

"there are no such actual products."  <u>Id.</u>

### C.  Analysis

The Court finds that there is substantial evidence in the

record to support the Commission's finding that significant imports

in any region of the country are likely to have a disruptive impact

on the overall U.S. market.  The strongest evidence that the ITC

points to in support of this finding consists of pricing data

submitted by Mittal USA on remand.  The ITC analyzed the regional

price data in pairs, and concluded that the correlation coefficient

for prices between the West and Midwest, the Midwest and Gulf, and

the Gulf and the West, each exceeded 0.98, respectively.  Remand

Determination at 20 n.69.  It is true that the ITC's analysis does

not include any empirical historical observation of the actual

national price effect of some burst of regionally-confined imports

in the past.  As such, it would be difficult to state with absolute

certainty what effect an influx of regionally-confined imports would have on nationwide prices.  However, the Commission did not attempt to make such a bold prognostication.  Instead, it merely concluded that "any significant influx of imports into a particular region that would cause a regional price dislocation would affect prices nationwide."  Id. at 20 (emphasis added).  The Court finds that a reasonable mind would accept the high level of correlation between regional prices as adequate support for this conclusion, formed as a conditional statement, and therefore constitutes substantial evidence within the meaning of the standard of review. See Huaiyin Foreign Trade Corp., 322 F.3d at 1374.

     The Court finds that there is also substantial evidence in the record to support the Commission's finding that pricing practices that would negatively impact Mittal USA's competitors are likely also to impact Mittal USA.  Specifically, the Court notes the evidence indicating that there are no regional markets in the United States to which ArcelorMittal could direct imports while maintaining stability in the U.S. market and protecting its domestic subsidiary from harm.  On remand, Mittal USA submitted a chart purporting to show domestic shipments of hot rolled steel more than 1000 miles from Chicago.  See ArcelorMittal Factual Submission on Remand, Ex. 6, (CR 433R).  This chart indicates that between 2005 and the first quarter of 2007, Mittal USA shipped hot rolled steel to 12 continental states that have some portion of

land further than 1000 miles from Chicago.  <u>See id.</u>  The chart
clearly indicates that Mittal USA's domestic shipments reach all
regions of the United States.  The Court further notes the
Producers' Questionnaire, filled out by Mittal USA, explicitly
indicates that every geographic market area in the United States is
served by the firm's hot-rolled steel.  <u>See</u> Mittal USA Producers'
Questionnaire, Part IV-B-9 (CR 126).  The Court finds that taken
together, the questionnaire response and chart constitute more than
a mere scintilla of evidence in support of the ITC's conclusion
that there are no regions of the U.S. where ArcelorMittal could
import hot rolled steel, to which Mittal USA does not already ship
domestically.  <u>See</u> <u>Altx, Inc.</u>, 370 F.3d at 1116.

The Court also finds that the arguments advanced by Plaintiff
and Plaintiff-Intervenor do not effectively undermine the
Commission's conclusion.  Specifically, the ITC has given
appropriate consideration to the testimony of Louis Schorsch and
the affidavit of [[                    ]] which are the subject of much ado
by Plaintiffs.  <u>See</u> Remand Determination at 16-17.  Not only is it
inappropriate for the Court to re-weigh this evidence, or to
require the ITC to do so, but when the statements are viewed in
context, it is clear that they do not amount to the veritable
admissions against interest as Plaintiffs suggest.[10]  As for

_____

[10] Schorsch prefaces his statement about the effect imports
may have on ArcelorMittal's competitors by explaining that import
decisions are made in a way that ensures the price and volume

Plaintiffs' contentions that "a large percentage" of Mittal USA's sales are made pursuant to contract, and therefore do not compete on the spot market; the Court notes Plaintiffs' own concession that, "large percentage" or not, [[        ]] of Mittal USA's sales do compete on the spot market--a percentage large enough to ensure Mittal USA's ongoing concern with spot market prices.    Nucor Comments at 16.    In sum, the Court sustains this aspect of the ITC's volume determination as supported by substantial evidence and otherwise in accordance with law.

3.    **Prior Business Practices**

    A.    **The Commission's Determination on Remand**

    In its remand instructions, the Court required the Defendant to further explain the behavior of ArcelorMittal and its predecessor company, Ispat International, with respect to their past practice of exporting to countries in which they maintained production facilities.[11]  Consistent with its earlier findings, the

---

levels will not disrupt Mittal USA's domestic operations. See Administrative Record, Tr. at 219 (PR 253) [[      ]] statement about the decision to permit ArcelorMittal International to serve certain geographic regions outside of Mittal USA's scope was framed strictly in the hypothetical. See ArcelorMittal Factual Submission on Remand, Ex. 8, ¶ 6 (CR 433R).

    [11] During the original period of investigation, Ispat International owned Ispat Inland, Inc. (a U.S. producer) as well as Ispat Karmet, the only hot-rolled steel producer in Kazakhstan. Within this period, U.S. imports from Kazakhstan went from 130,329 short tons in 1998 to 192,470 short tons in 2000, an increase of 47.7 percent. See Final Determination at I-8 (Table I-1) (PR 453).

Commission determined that the record does not support an inference

that ArcelorMittal will likely make significant shipments of hot-

rolled steel from its low cost production facilities into the U.S.

market. See Remand Determination at 26.   Unlike its previous

position, however, the ITC does not rely solely on a market share

analysis of Ispat and its affiliates.   Instead, the Defendant

identifies changes in the policy, structure and export trends of

the ArcelorMittal organization since the original period of

investigation.

## B.   Parties' Arguments

On remand, the Commission offers three distinct evidentiary

points as the basis for its determination.   First, Arcelormittal

exerts a more centralized system of control over its exports from

affiliated producers than did its predecessor Ispat International.

See Remand Determination at 23. According to the ITC, this is an

important change in the evolution of Mittal USA and distinguishes

its practices from those of Ispat. After the formation of

ArcelorMittal the newly formed entity continued the policy, [[

]] of not using third-party trading companies.[12]

See id.  Prior to the adoption of this policy, whereby Ispat - and

ultimately ArcelorMittal - became the solitary sales agent for

---

[12] [[

]] Remand

Determination at 23.

corporate affiliates abroad, imports of subject merchandise from these affiliates were not controlled by the corporate parent. <u>See id.</u> The efficacy of this policy, argues Defendant, is evidenced by the decrease in quantity of hot-rolled steel imported by Ispat from Kazakhstan during the original period of investigation. Because Ispat was responsible for approximately [[          ]] of the imports from Kazakhstan in 1998, but only [[          ]] of those imports in 2000, the increase in subject imports during the original period of investigation was due not to Ispat, but rather the third-party traders that the new corporate policy was intended to eliminate. <u>Compare</u> Final Staff Report at Table I-1 (CR 376) (U.S. import data from Kazakhstan during original period of investigation), <u>with</u> ArcelorMittal Factual Submission on Remand, Ex. 5 (CR 433R) (breakdown of hot-rolled steel imports from Kazakhstan by Ispat during the original period of investigation); <u>see also</u> Remand Determination at 23-24.

Second, the Commission restates its previous position that Mittal USA has a [[   ]] larger presence in the U.S. market than did Ispat Inland, and that this larger market share provides a strong incentive to strictly adhere to its stated policy of maintaining market stability through the restriction of imports from affiliated producers. <u>See</u> Remand Determination at 24.

Finally, in accordance with the court's instructions, the ITC examined the pattern of Mittal USA's exports to Western Europe in

light of the presence of other ArcelorMittal production facilities.
The ITC can identify only one shipment of hot-rolled steel to a
European country in which ArcelorMittal maintained a presence, a
single 12,000 ton shipment to Belgium.[13]  See Remand Determination
at 25.   Therefore, the Commission argues, the record does not
support  the  inference  that  ArcelorMittal  will  likely  export
significant shipments of subject merchandise to countries in which
it operates hot-rolled steel production facilities.  See id. at 26.

     In Plaintiffs' first assertion of error, they posit that the
behavior of the Ispat organization prior to the assignment of the
antidumping and countervailing duty orders is "far more probative"
of  ArcelorMittal's  future  behavior  than  crediting  a  policy
instituted after the orders were put in place.  U.S. Steel Comments
at 28.  Therefore, Plaintiffs argue, the Commission is in error to
give more weight to policies made effective after the institution
of  relief  as  opposed  to  those  actions  taken  when  the  subject
countries had unlimited access to the U.S. market - a condition
that would be replicated if the orders are revoked.  See id.  For
example, the 47.7 percent increase in imports of hot-rolled steel
by  Ispat  from  Kazakhstan,  during  the  original  period  of
investigation,  is  identified  by  Plaintiffs  as  evidence  of  the
likely future behavior of ArcelorMittal based upon the theory that

_____

     [13] Because the questionnaires relied on by the Commission
did not break down export quantities by destination, there is a
dearth of record evidence on this point.

should the orders be revoked, ArcelorMittal will similarly increase the volume of hot-rolled steel exported to the U.S. market.   See Nucor Comments at 17.

Next, Plaintiffs challenge the ITC's conclusion that the record is limited to only one specific instance in which ArcelorMittal exported hot-rolled steel to a European country wherein it maintained a production facility. As alleged by Plaintiffs, "the record actually contains very significant evidence about Mittal USA's exports to Europe." U.S. Steel Comments at 29. The evidence to which Plaintiffs refer includes two press releases; one in which Mittal USA acknowledges the previously identified 12,000 ton shipment to Belgium; and another describing Mittal USA's intention to become an active exporter of steel.   See U.S. Steel's Post-Hearing Brief, Ex's. 15, 16 (PR 328).   The third piece of evidence Plaintiffs cite to is the testimony of Louis Schorsch who speaks briefly about exports to Western Europe.   See Administrative Record, Tr. at 334 (PR 253).  Plaintiffs suggest that this evidence is indicative of ArcelorMittal's intention to take advantage of the relatively attractive market conditions in the U.S. even if that market contains another ArcelorMittal facility.   See U.S. Steel Comments at 30.

Lastly, Plaintiffs discount the Commission's reiteration of its market analysis claim, arguing that it is essentially the same explanation rejected by the Court in its previous opinion.   See

U.S. Steel Comments at 27; Nucor Comments at 18.

###### C.   Analysis

In evaluating whether the likely volume of subject imports will contribute to the recurrence or continuation of material injury within a reasonably foreseeable time, the ITC is statutorily required to take into account numerous factors including its previous injury determination conducted prior to the order being issued.   See 19 U.S.C. § 1675a(a)(1)(A).   As the Statement of Administrative Action accompanying the statute explains, the purpose of this inquiry is to examine the most recent period of time in which subject imports competed without the discipline of an antidumping or countervailing order in place.   See Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. 5110 (H.R. Doc. No. 103-316), reprinted in 1994 U.S.C.C.A.N. 4040, 4209.   Section 1675a(a)(1)(A) does not, however, require a "full blown reconsideration" of the original injury determination in a sunset review.   See Consolidated Fibers, Inc. v. United States, 30 CIT 1820, 1823, 465 F. Supp. 2d 1338, 1341 (2006).   Instead, that provision simply requires the Commission take into account its findings as to volume, price, and impact of subject imports prior to the institution of an order. Neither the statute nor its legislative history direct the ITC to distinguish every factor of its original investigation findings from those made in a sunset review.   Presently, the ITC did not disregard the findings from its

original investigation, but rather cited to such findings repeatedly. <u>See, e.g.</u>, Remand Determination at 22-25. The Commission discussed its negative determination in terms of the likely volume of imports from the subject countries while incorporating and distinguishing various aspects of the original investigation. <u>See id.</u> at 21-26. Therefore, Plaintiffs' claim that the behavior of ArcelorMittal's predecessor, Ispat, is far more probative than the current practices of the corporation and its affiliates, merely replicates their previous position urging the Court to re-weigh the evidence considered by the Commission. Once again, the Court is disinclined to accept Plaintiffs' invitation to displace the agency's interpretation of that evidence with its own.

The Court rejects Plaintiffs' argument on additional grounds. Namely, that they have pointed to no evidence impeaching the credibility of the data relied on by the Commission. Other than the single 12,000 ton shipment to Belgium, the press reports cited by Plaintiffs make no mention of any actual exports of hot-rolled steel to a country with an ArcelorMittal affiliate. At most, the statements relied upon by Plaintiffs indicate a willingness on the part of Mittal USA to expand its export activity to parts of Western Europe, which may or may not include countries in which ArcelorMittal has a production facility. Such vague and circumstantial evidence is simply insufficient to overcome

Plaintiffs' high burden in this case.  In this way, the witness testimony, e-mail correspondence and producer's questionnaire utilized by the Commission in making its determination must preponderate.  Accordingly, the Court holds that the ITC adequately investigated and explained the basis for its finding that the prior business practices of ArcelorMittal's predecessor, Ispat International, do not support an inference that ArcelorMittal will likely make significant export shipments to other countries in which it operates hot-rolled steel production facilities.

**4.   Neglected Volume Considerations**

   **A.   The Commission's Determination on Remand**

     This Court previously found that there were several pieces of evidence in the record that had not been properly considered by the Commission in its initial sunset review determination, and that if considered, may have weighed against revoking the relevant orders. On remand, the ITC was instructed to "reassess and further explain evidence opposed to the ITC's volume determination, including excess capacity, export orientation of the Mittal Countries' producers, attractiveness of the U.S. market, and capacity increases in alternative export markets."  <u>Nucor</u>, 33 CIT at ___, 605 F. Supp. 2d 1361, 1382.

     With respect to excess capacity of the subject countries, the Commission determined that while the Court had correctly identified excess capacity at the end of the period of review, it was not

persuaded that the subject producers could or would utilize that capacity.   Remand Determination at 26-27.   In support, the Commission pointed out that through the duration of the period of investigation and the period of review, capacity utilization remained well below maximum.   <u>Id.</u> at 27.   On this basis, the Commission concluded that the subject producers' excess capacity is nothing more than "theoretical."   <u>Id.</u>   The Commission also concluded that "ArcelorMittal lacks the incentive to increase capacity utilization . . . in light of its corporate policies." <u>Id.</u> at 28.   Moreover, the excess capacity of the subject countries is [[                                                                    ]] and Mittal USA has shown higher levels of capacity utilization as well.   <u>Id.</u>

With respect to export orientation of the subject countries, the ITC found that exports, when viewed as a proportion of total shipments, remained "relatively stable throughout the period of review, ranging between [[    ]] percent and [[    ]] percent during the six calendar years."   <u>Id.</u> at 28-29.   The Commission found that these percentages did not "signify that the subject industries are heavily export-oriented."   <u>Id.</u> at 29.   The ITC also noted that the majority of these subject producers' exports were directed to regions outside the U.S.: from Kazakh and Romanian producers to [[                                        ]], from Romania to [[                      ]], and from South Africa [[

]] _Id._ at 29 n.104.

With respect to the attractiveness of the U.S. market, the Commission included a footnote in its remand determination acknowledging that the U.S. market has a "relatively open nature" and "higher prices than some other world markets."  _Id._ at 29 n.105.  However, the Commission reasoned that in light of ArcelorMittal's U.S. and Canadian operations and stated corporate policies, the attractiveness of the U.S. market was unlikely to incentivize the subject producers to target the U.S. market.  _Id._

With respect to capacity increases in export markets, specifically China, the ITC's finding was twofold.  First, China had not been a primary export market for any of the subject producers before it shifted from being a net-importer to being a net-exporter, so the subject countries did not lose an export market as a result of China's shift.  _Id._ at 29.  Second, the ITC found that the subject countries' primary export markets were not in southeast Asia, where it reasoned China would be directing most of its exports.  _Id._  Consequently, the ITC determined that the subject countries did not face increased competition from China as a result of China's shift in status from net-importer to net-exporter.  _Id._ at 29-30.

**B.  Parties' Arguments**

Plaintiffs focus their remand comments on excess capacity by highlighting what appears to be large excess capacity in the

subject countries.  Nucor points out that the subject countries

experienced a "nearly [[         ]] increase in capacity" during

the period of review, which, in absolute terms, is "[[

]] volume of subject imports from the Mittal Countries during

the last year of the period of investigation."  Nucor Comments at

20.  Accordingly, Nucor asserts that the Commission's conclusion

that the subject countries have experienced "'at most incremental

growth in capacity and incremental declines in capacity utilization

in the subject countries,'" is fallacious.  Id. (quoting Remand

Determination at 8); see also U.S. Steel Comments at 31-35.

    Nucor also takes issue with the Commission's characterization

of the subject countries' excess capacity as merely "theoretical."

Nucor Comments at 21.  Nucor argues that data relating to excess

capacity was obtained by questionnaires which "specifically

instructed the Mittal country producers to report actual, not

theoretical, capacity, and [that] there is no evidence to suggest

that they did not report actual capacity."  Id.  U.S. Steel points

out that the questionnaire instructions specifically request that

the respondent provide "'[t]he level of production that [the

producer] could reasonably have expected to attain during the

specified periods.'"  U.S. Steel Comments at 15 (quoting Foreign

Producer Questionnaire Instructions at 8 (PR 132)).

    Nucor and U.S. Steel also both push back on the Commission's

finding about the export orientation of the subject countries.

Nucor argues that Romania, Kazakhstan  and South Africa export a

"[[                         ]] of total shipments than [[


                                    ]] and [that] in its

affirmative determination for China, India, Indonesia, Taiwan,

Thailand, and Ukraine, the Commission relied on subject producers'

export orientation to support continuation of the orders."  Nucor

Comments at 22-23.   Nucor claims that it is "arbitrary for the

Commission to cite a particular factor in support of continuation

in one instance, but discount it entirely in another wherein the

evidence in support is greater."  Id. at 23.   U.S. Steel argues

that the figures the Commission identified as reflecting the

proportion of subject producers' export shipments to total

shipments ([[           ]] percent), are misleading because [[



                     ]]  U.S. Steel Comments at 32-33.  U.S. Steel

claims that the proportion of export shipments to commercial

shipments suggests [[

                     ]]  Id. at 33.

     With respect to the attractiveness of the U.S. market, U.S.

Steel charges that the extent of the Commission's treatment of this

issue – a footnote - is insufficient.  Id. at 33-34.  And last,

U.S. Steel challenges the Commission's remand determination on the

capacity increases of alternative export markets, namely, China.

U.S. Steel claims that in 2006, [[      ]] percent of exports from

the subject producers "went to Asian markets other than China."

Id. at 35.  In the same year, of "the Chinese producers who

responded to the Commission's questionnaire" 57.7 percent of their

exports were shipped to this same market.  Id.  U.S. Steel thereby

concludes that Chinese producers are focused on a market that is

critical to producers in the Mittal Countries.  Id.

     In its rebuttal comments, the Commission reiterated that

during the nine-year period examined by the ITC, [[

          ]] tons of excess capacity in the subject countries

was never utilized.  ITC Rebuttal Comments at 26.  The ITC also

acknowledged that U.S. Steel is correct in pointing out that a

relatively large portion of the subject countries' shipments were

exports, but pointed out that this proportion of exports during the

period of review remained "relatively stable."  Id.  The Commission

attempted to defend its characterization of the subject countries'

excess capacity as "theoretical" by emphasizing that in using that

term, it only meant to draw attention to the fact that the subject

producers have no history of operating at full capacity, and are

unlikely to do so in the near future.  Id. at 27.  Moreover, the

ITC asserts that the mere existence of excess capacity in the

subject producers "is insufficient to mandate a finding of

significant likely subject import volume."  Id. at 28 (citing Nucor

Corp. v. United States, 32 CIT ___, 569 F. Supp. 2d 1328, 1349

(2008)).

     With respect to U.S. Steel's arguments about the effect of

China on the subject producers, the ITC points out that it

considered China's production extensively, and determined that the

subject producers' exports to third countries were not affected by

increasing exports from China.  Id. at 28-29.  The Commission also

extensively and repeatedly emphasized its belief that ArcelorMittal

will abide by corporate policies to have producers focus on local

markets, to limit production to promote market stability, and to

permit Mittal USA veto power over subject imports.  See generally

id. at 26-31.  The Commission concludes by accusing Nucor and U.S.

Steel of wanting the Court to do nothing more than re-weigh the

evidence that the Commission already considered.  Id. at 31.

     C.   Analysis

     The Court shares Plaintiffs' concerns about the Commission's

characterization of the excess capacity of the subject countries as

"theoretical," to the extent that this suggests that subject

producers are incapable of utilizing the excess capacity that they

have reported.  See Remand Determination at 27.  As U.S. Steel

pointed out, the subject producers were explicitly instructed to

provide data about the level of production that the producer "could

reasonably have expected to maintain during the specified periods."

Foreign Producer Questionnaire Instructions at 9.  Moreover, closer

inspection of the Foreign Producer Questionnaire responses provided by the Mittal affiliated producers in Romania, South Africa and Kazakhstan confirms that all three producers complied with that instruction.  In their responses, each Mittal affiliated subject producer indicated that production capacity had been adjusted downward to take into account lost production time due to planned and unplanned repairs, delays, maintenance and other shutdowns. See Foreign Producer Questionnaire of Mittal Steel Galati at Ex. 3 (CR 113); Foreign Producer Questionnaire of Mittal Steel South Africa at 23 (CR 78); and Foreign Producer Questionnaire of Temirtau at 15 (CR 145).  In light of what appear to be carefully calculated responses, the ITC's characterization of subject producer excess capacity as merely "theoretical" is problematic.

Presumably, the purpose of the Commission's query into subject producer excess capacity during a sunset review is to determine whether the subject producers would be capable of ramping up production if the orders are permitted to expire.  While a report of little or no excess capacity would weigh in favor of permitting the antidumping orders to sunset, a report of significant excess capacity may be a legitimate cause of concern for the domestic industry.  The Commission should not seek to diminish the weight of reported subject producer excess capacity by characterizing it as "theoretical," and thereby implying that the subject producers are somehow incapable of utilizing their reported unused capacity.  The

numbers speak for themselves.

Nevertheless, the Court's objection is primarily with the Commission's terminology.  The excess capacity figures do not suggest that the subject producers are <u>incapable</u> of expanding output, but when considered in light of historically low capacity utilization rates, there is reason to believe that the subject producers are <u>unlikely</u> to expand output, even upon revocation of the orders.  Moreover, the Court also finds significant that the scale of the subject producers' excess capacity is [[          ]] by the excess capacity of Mittal USA.  <u>See</u> Remand Determination at 28. Given ArcelorMittal's policy to source locally, these figures support the Commission's conclusion that dumping or injury is not likely to recur if the orders are revoked.

With respect to export orientation of the subject producers, the Court finds that the arguments of Plaintiff and Plaintiff-Intervenor are ineffective.  First, U.S. Steel's contention that the percentages cited by the Commission [[

                        ]] rather than of total shipments, as the Commission claims, is untrue.  <u>See</u> U.S. Steel Comments at 32. Based on the data found in the Final Staff Report at Tables IV-31, IV-35, and IV-40, the Court finds that the percentage of exports as a share of total shipments does, indeed, range from [[

]] percent.[14]  Moreover, U.S. Steel fails to offer a compelling

reason why this figure does not accurately represent the extent to

which the subject producers are export oriented, and why the better

ratio to consider is total exports to total commercial shipments.

Surely, the volume of production that is internally consumed is

pertinent to the question of how export-oriented a particular

producer is.[15]

Turning to Plaintiff's concerns regarding export orientation,

the Court is similarly unconvinced.  Plaintiff is correct that in

the Commission's initial sunset review determination, the ITC

referred to the hot-rolled steel industries of Kazakhstan, Romania,

and South Africa, along with the six other countries for which

---

[14] Total shipments is a composite figure that includes
internal consumption, commercial home market shipments, and total
exports. The figure for total shipments is usually close to, but
not identical to total production, the difference owing primarily
to carryover end of period inventories. In [[     ]], the total
exports from the Mittal countries totaled [[          ]] short
tons, while total shipments from the Mittal countries totaled
[[          ]] short tons, for a ratio of [[     ]] percent. In
[[     ]], by comparison, the total exports from the Mittal
countries totaled [[          ]] short tons, while total shipments
from the Mittal countries totaled [[          ]] short tons, for
a ratio of [[     ]] percent. See Final Staff Report at Table IV-
31, IV-35, and IV-40 (CR 376).

[15] For example, suppose 98% of a subject producer's total
shipments was internally consumed, 2% of total shipments were
exported, and nothing was shipped commercially to the home
market.  Under U.S. Steel's reasoning, such a producer would be
considered extremely export dependent, because all of its
commercial shipments are being exported.  However, under the
Commission's more logical analysis, it is clear that such a
producer is not that export-dependent at all, exporting a mere 2%
of total shipments.

antidumping orders remained in place, as "export[ing] a large percentage of total shipments." Views of the Commission at 20 (CR 427). Context, however, is everything.  In this portion of its opinion, the Commission was deciding whether or not to cumulate the respective subject countries for the purposes of the sunset review. See id. at 13-29.  Specifically, as a part of that inquiry, the Commission was addressing the question of whether the subject imports "are likely to have no discernible adverse impact on the domestic industry in the event of revocation of orders covering those imports."  Id. at 20.  The Commission characterized the percentage of exports from the Mittal Countries as "large" in the course of deciding that imports from the Mittal Countries were not likely to have no discernible adverse impact.  In other words, because of the specific question the Commission was addressing at the cumulation stage, the bar had been set low.  The Court finds that it is not arbitrary, nor even inconsistent to characterize export percentage as "large" because a country's exports are not likely to have no discernible adverse impact, and then subsequently, to find that the same country is not "heavily export-oriented" when those percentages fall in the range of [[

          ]] percent[16].   See id.; see also Remand Determination at 28-

---

          [16] The Court also notes that export orientation is not considered in isolation, and that the percentages discussed above are meaningless apart from considering absolute volumes. While Kazakhstan, Romania and South Africa may have larger percentages of exports to total shipments than the other six countries, in

29.

Next, the Court considers the argument of Plaintiff-Intervenor with respect to the attractiveness of the U.S. market.  Ultimately, the Commission has credited the testimony and data provided by ArcelorMittal regarding its corporate policies to source hot-rolled steel locally and to provide the domestic subsidiary veto power over imports.  Because the Court has already found that the Commission's acceptance of ArcelorMittal's stated corporate policies is supported by substantial evidence and otherwise in accordance with law, the Court is satisfied with the agency's explanation of the attractiveness of the U.S. market.  See Discussion IV.1.C., supra.

On the issue of China's shift from net-importer to net-exporter status, this Court's previous instructions to the Commission consisted essentially of a requirement to address, and at a minimum, to explain why China is irrelevant with respect to the Mittal Countries.  The Court finds that in the Commission's Remand Determination, it has thoroughly considered the evidence about the shift in China's import/export patterns.  See Remand Determination at 29-30.  The Court agrees that the arguments of the Plaintiff-Intervenor on this issue amount to nothing more than a

---

2006, total export volumes of the three countries was [[            ]] short tons, while the export volume of the other six countries was [[            ]] short tons. See Final Staff Report at Table IV-31, IV-35, and IV-40 (CR 376); see also Views of the Commission at 50 (CR 427).

desire to re-weigh the evidence.  While it is true that comparable percentages of exports are directed to Asian markets other than China from the Mittal Countries, on one hand, and from China, on the other, the Court does not see reason to disturb the Commission's volume determination on that basis.  For the foregoing reasons then, the Court finds that the Commission's determination regarding excess capacity, export orientation, the attractiveness of the U.S. market and China's shift from net-importer to net-exporter status to be supported by substantial evidence in the record and otherwise supported by law.

5.   **Potential Price Effects**

   A.   **The Commission's Determination on Remand**

   The Court predicated its remand instructions on the potential price effects of the subject imports on the correlative effects of the Commission's faulty volume analysis.  Because the relationship between the imports' potential price effects and their volume is obvious, it logically follows that likely volume findings deemed unsupported by substantial evidence would impact the agency's conclusions with regard to price effects.  As a result, the ITC was ordered on remand to reassess its potential price effects analysis in accordance with the agency's revised volume determination.

   Consistent with its decision in the Final Determination, the ITC concluded that upon revocation of the antidumping and countervailing duty orders, the likely volume of subject imports

will be small, and in light of ArcelorMittal's efforts to price

these imports in a manner so as not to disrupt the U.S. market for

hot-rolled steel, there will not likely be significant underselling

of hot-rolled steel from the subject countries.  See Remand

Determination at 32; see also Final Determination at 46.

### B.  Parties' Arguments

Both Nucor and U.S. Steel advance arguments that are grounded

on the assumption that the Commission's likely volume finding

cannot be sustained.  As such, Plaintiffs aver, that finding cannot

support the agency's likely price effects analysis.  See U.S. Steel

Comments at 36; Nucor Comments at 23.  Nucor further alleges that

the ITC disregarded significant pricing evidence, and cites to data

from the Final Determination demonstrating that the average unit

values[17] ("AUVs") of the subject countries' home markets and third

country exports were [[                         ]] than the AUV of U.S.

commercial shipments during the period of review.  See Nucor

Comments at 23-24 n.9.  Thus, Nucor maintains, the potential for

significant underselling of hot-rolled steel in the U.S. market

combined with the Commission's recognition that even moderate

levels of undersold merchandise will have a significant price

suppressing or depressing effect, undermines the ITC's analysis.

---

[17] Average unit values are computed by multiplying, the
price of each product times the quantity sold, adding these
figures, and then dividing by the total number of products sold.
See United States Steel Group, 96 F.3d at 1364.

See id. at 24.

The Commission bases its price effects determination primarily on the reaffirmation of its likely volume analysis.  That is to say, while ArcelorMittal may import modest levels of hot-rolled steel into the U.S. from its overseas affiliates, the volume of such imports would not be significant.  Moreover, Defendant claims, the stated policy of ArcelorMittal is to ensure that when the company did import products from its affiliates [[



]] Remand Determination at 32.

### C.   Analysis

Having already found that the Commission's likely volume determination is supported by substantial evidence and otherwise in accordance with law, the Court rejects Plaintiffs' arguments regarding the sufficiency of the agency's price effects analysis. In addition, Plaintiffs' complaint about the ITC's assessment of the pricing evidence is clearly in error.  Far from being dismissive of the pricing data, the Commission cited to this information in the explanation of its price effects determination. See Remand Determination at 31-32.  In fact, the ITC specifically discussed the underselling data from both the original period of investigation and the five-year review.  See id.  While acknowledging the instances of underselling which form the basis of

Nucor's claim, the ITC concluded that this evidence was not dispositive when examined against the backdrop of ArcelorMittal's practices regarding imports from affiliated firms. To be sure, this evaluation of the evidence is more than mere conjecture, and the agency's decision is reasonably discernible to the Court. See NSK Corp. v. United States, 33 CIT ___, 637 F. Supp. 2d 1311, 1318 (2009) (citing NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009)). Therefore, the Court finds that the Commission sufficiently explained its price effects findings in the context of its likely volume determination as mandated by the Court. As a result, the Commission's determination is supported by substantial evidence and otherwise in accordance with law.

**6.   Likely Impact**

> **A.   The Commission's Determination on Remand**

The Court instructed the Commission on remand to reconsider its likely impact determination in light of its revised volume and price effects determinations. Nucor, 33 CIT ___, 605 F. Supp 2d 1361, 1383. The Commission was also required to "account for and explain the poor performance of the domestic industry in the latter portion of the POR." Id. Because the ITC did not reach a different conclusion on either the volume issue or the price effects issue, it similarly concluded that the subject imports were not likely to have a significant impact on the domestic industry. Remand Determination at 33. The Commission also attributed the

domestic industry's poor performance in the latter portion of the POR to "flat or declining prices after 2006." Id. However, "[a]ll Commissioners who are joining this opinion concluded that the industry was not in a vulnerable condition, notwithstanding substantial performance declines in interim 2007, in light of its overall profitability since 2004." Id.

**B.   Parties' Arguments**

Plaintiff Nucor responds to the Commission's likely impact determination simply by invoking its objections to the Commission's volume and price effects determinations, without raising any new objection.  Nucor Comments at 24-25.  Plaintiff-Intervenor U.S. Steel contends that in reaching an affirmative determination in the original sunset review on certain countries (not involved in this litigation), the Commission determined that imports from those countries would have a negative impact on the domestic industry. U.S. Steel Comments at 37.  The Commission responds to Nucor's comments by pointing out that Plaintiff does not raise any new arguments on the likely impact analysis, and urges that the ITC should be affirmed.  ITC Rebuttal Comments at 32-33.

**C.   Analysis**

As the Court has already sustained the Commission's volume and price effects analyses, and upon hearing no compelling argument from Plaintiff or Plaintiff-Intervenor as to why the ITC's likely impact analysis is flawed, the Court finds that the likely impact

**Court No. 07-00454**                                              **Page   48**

analysis is supported by substantial evidence and is otherwise in
accordance with law.

<u>**CONCLUSION**</u>

For all the reasons set forth above, the Commission's negative
injury determination, reached on remand, is sustained in its
entirety.  Judgment shall be entered accordingly.


<u>     /s/ Gregory W. Carman     </u>
**GREGORY W. CARMAN**
**JUDGE**



Dated: January 27, 2010
       New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Gregory W. Carman, Judge**

```
_____  :
                                      :
NUCOR CORPORATION,                    :
                                      :
               Plaintiff,             :
                                      :
               and                    :
                                      :
UNITED STATES STEEL CORPORATION, and AK :
STEEL CORPORATION,                    :      Consol.
                                      :      Court No. 07-00454
               Plaintiff-Intervenors, :
                                      :
               v.                     :
                                      :
UNITED STATES,                        :
                                      :
               Defendant.             :
_____  :
```

<u>**JUDGMENT**</u>

This action having been submitted for decision, and the Court, after due deliberation and consideration of all papers and proceedings, having rendered a decision herein; now, therefore in conformity with said decision, it is hereby

**ORDERED, ADJUDGED AND DECREED** that the Remand Determination of the United States International Trade Commission, dated July 8, 2009, is sustained in its entirety; and it is further

**ORDERED** that judgment is entered for Defendant.


                                    /s/ Gregory W. Carman
                                    **GREGORY W. CARMAN**
                                    **JUDGE**

**Dated:** January 27, 2010
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                   Deputy Clerk